WILLIAMSON v. THOS. R. WILLIAMS, Adm'r, etc.

1. FRAUD. *Burden of proof.* The burden of proving that a deed from a father to a son is voluntary and fraudulent is upon the attacking creditor.

2. DEFECTIVE TITLE. *Presumption of knowledge.* The acceptance of a mere quit claim deed, or one with only a special covenant of warranty, is *prima facie* proof that the conveyee knew the title was defective.

3. NOTICE. *Lis pendens, Commencement of.* As to strangers to the suit, *lis pendens* does not commence until the service of process upon the defendant, even though a copy of the bill had previously been read to such defendant by a co-defendant who had been served with process.

4. FRAUD. *Evidence. Declarations of conveyor.* If a party makes a deed, and retains possession inconsistently with the deed, his statements in reference to the ownership, or contract or character of possession, are admissible against the conveyee; but it is otherwise when his possession is consistent with the terms of the deed or contract.

5. FRAUD. *Innocent purchaser. Resulting trust.* Where property is fraudulently conveyed to evade creditors to an assignee, cognizant of the fraud, who conveys to an innocent third person, who pays a full consideration in ignorance of the fraud, the consideration paid takes the place of the land conveyed, and the mesne fraudulent assignee becomes liable therefor to the creditors of the original grantor.

FROM FAYETTE.

Appeal from the Chancery Court at Somerville. H. J. LIVINGSTON, Ch.

JONES & GALLOWAY for complainants.

H. C. MOORMAN, C. C. HARRIS and STAINBACK & RIDDICK for defendants.

FREEMAN, J., delivered the opinion of the court.

The original bill is filed to enforce a debt on which judgment had been had in favor of complainant against Young Montague. It seeks, first, to set aside a conveyance of 180 acres of land made by Young Montague to his son, P. A. Montague, of date May 21, 1866; and, second, a conveyance of another tract of 591 acres in Fayette county, made, as charged, to W. T. Jones; another tract of 80 acres is mentioned, but seems to be abandoned, as no proof is tendered in reference to it. These lands are sought to be subjected to the payment of complainant's debt, on the ground, as to the 180 tract, that the sale to P. A. Montague was made with the fraudulent intent to hinder and delay the creditors of Young Montague in the collection of their debts, especially

complainant. As the basis for this charge, the fact is averred, to use the language of the bill, that P. A. Montague not only paid no consideration for said tract of land, but he had not the ability to purchase and pay for same. It is also added, he knew of the fraudulent purpose of the father, and participated in it.

We will dispose of this branch of the case first. P. A. Montague and the father were both dead when this bill was filed. Their heirs are the defendants. They answer, and deny in most positive terms the fraud charged and the inability of P. A. Montague, and add to this denial the statement that on the day of the purchase one of the sisters, Minerva, loaned him $975—the consideration being $1,350—and this fact is admitted by agreement of counsel in the record. The answer challenges the complainant to proof of the facts thus charged, and is sworn to, oath not having been waived by complainant.

There is no proof in the record sustaining the charge. As a matter of course it cannot be taken for granted to be true. The answers are responsive to the bill, and even if we assumed the facts, could not, or were not within the knowledge of the respondents, the heirs, yet certainly it makes an issue on which complainant held the affirmative, and was bound to make it good.

There is nothing in the case of *Alley* v. *Connell.* 3 Head, 580, when carefully examined, to the contrary of this conclusion. It is true it is stated in one part of the opinion that the alleged demand of

Mrs. Connell, the mother, part of the consideration
for the deed, was charged to be unfounded and fab-
ricated for the occasion, and that the answer, in
strong terms, asserted the contrary. It is then added,
"there is no proof." It is evident, however, by
this the court meant no witness testified on this
question, for in the next sentence the facts are given
on which the suspicion is based, which was the basis
of the principle announced, that is, the claim was in
the form of an account by the mother against the
son, and "upon its face," say the court, "is suspi-
cious, and the time and circumstances of its settle-
ment tend to strengthen suspicion of its fairness."
Some of these circumstances are stated in a previous
part of the opinion. These circumstances of suspi-
cion, which were held to be strong, were held to
make it incumbent on defendant, by satisfactory proof,
to show the payment of the consideration. It was
not held that a mere charge in the bill, denied by
the answer, raised such suspicion and compelled de-
fendant so denying to make out his denial by satis-
factory proof. The same is the case of *Smart and*
*Wife* v. *Waterhouse,* 6 Hum., 158, to which the court
refer for the proposition laid down.

We cannot sustain the chancellor's decree as to
this tract, without assuming that a sale to a son,
who is charged to have never paid anything, nor
been able to do so, which is denied, and facts stated
and proven tending to show very largely that ability,
is to be held fraudulent. In fact this decree can-
not be sustained, on this record, except by holding

that a sale to a son, when attacked, is *per se* fraudulent, unless conclusively shown, even years after the death of the vendor and vendee, that the money was actually seen to have been paid—a thing next to impossible to be done in many, if not most such cases.

The decree will be reversed and bill dismissed as to this tract of land.

We need not notice the question made as whether the cause was at issue as to this class of defendants, though we incline to the opinion the chancellor held correctly on the subject. The question does not go to the merits, and we are not inclined to turn cases on such objections when the merits can be fairly reached on the record. As to the other parties, the cause was clearly at issue as to them, and involved an entirely different tract of land, so that the objection is clearly not good as to them, even if we are to understand it as made for them, as probably was intended.

The case made in the bill as to the 591 acre tract is this: It is first charged that a tract of land of 81 acres was conveyed by Young Montague to W. F. Jones on February 14, 1867, and that this conveyance was made to defraud his creditors, and avoid paying complainant's debt. It is then added: "The said Montague in like manner conveyed the 591 acres fraudulently to W. F. Jones; that said sales were made without consideration, and these lands were fraudulently conveyed by said Montague to the said Jones with intent and for the purpose of

hindering, delaying and defeating the creditors of the said Montague in collecting their debts against him." It is not charged that Jones was unable to pay for this land.

It is then further charged that Jones, further to defeat the creditors of Montague, did, on the 13th of July, 1868, pretend to sell and convey to Wm. Wallace the said tract of land, Wallace being a son-in-law of Montague, and having knowledge of the fraudulent contrivances and arrangements. As evidence of the fact alleged, it is said—and the fact is that way—that Jones knew he had not a good title, because he conveyed only by a quit-claim deed; and also that Wallace knew that he had not a valid title when he purchased. All the charges of fraud are met by the answers with positive denials, and the quit-claim deed and purchase by Wallace thus explained: That Wallace wished to purchase from Montague, who told him he had sold to Jones; that he negotiated a trade with Jones, and it was agreed he (Wallace) was to be substituted as purchaser, and Jones released from the payment for said land, Wallace paying to Montague $915 in a store account (Wallace being a merchant), and giving in addition his two notes for $1,950, both due two years after date, to-wit, July, 1870, which Wallace says he has discharged and taken up, and will produce the same on hearing, if necessary.

While Wallace's denials of all knowledge that his father-in-law was indebted, and especially of complainant's debt, and his denial of fraudulent intent,.

is equally positive, still we are compelled to agree with the chancellor, that the proof overturns these denials by a reasonable preponderance.

First, it is not at all probable that a father-in-law would have sold and conveyed a tract of land of this kind fourteen months before, without his son-in-law, who seemed to have lived in the neighborhood, having heard of it. This he claims not to have done till he sought the purchase.

Second, he took only a quit-claim deed, or one of special warranty against Jones, or persons claiming under him. This is evidence of knowledge or suspicion of defective title, as held in *Hockaday* v. *Wilson*, 1 Head, 113; but as we have held in other cases, is not conclusive and may be explained. We see nothing in the facts that serve to explain the force of this fact in this case.

Third, Wallace says he had paid the notes given, had taken them up, and proposes to produce them as evidence if necessary in this case. We think it was very necessary, and his failure to do so weighs heavily against him, especially in view of the fact proven that the administrator of Young Montague swears that no such notes ever came to his possession, and he was appointed long before the time they fell due. Many inconsistencies, as well as contradictions, are found in Wallace's testimony, which might be pointed out to show that he bought the land fraudulently, as a device, no doubt, to aid his father-in-law in escaping from the payment of a heavy security debt.

We now come to the last question on which the case as to this land finally turns. Wallace, on the 31st of August, sold and conveyed this land to J. C. Terry, a commission merchant of the city of Memphis, for $7,000. Terry is brought into this litigation by a supplemental bill, filed November 18, 1871, and the charge added to the pleadings as to him is substantially as follows: That to aid in the fraudulent devices charged in the original bill, "Wallace pretended to sell and did fraudulently convey" this land to Terry, after your orator's original bill was filed, and after the writ of subpœna to answer had been served on him; and this sale and conveyance were made with the fraudulent design further to place said land beyond the reach of the creditors of Young Montague. It is also charged that Terry purchased from Wallace with full knowledge that said Wallace was selling and conveying the land to him to defeat the creditors of said Montague from subjecting the land to the payment of their debts.

The case made in the bill stands on these two grounds: First, a purchase after a *lis pendens*, by service of subpœna on the vendor; and second, that the sale was fraudulently made by the vendor, and that fraud known and participated in by the vendee.

The chancellor held the conveyance to Terry was ineffective on both grounds. We proceed to examine each on the facts shown in the record.

It appears, clearly, that the subpœna in the case was not served on Wallace until the 7th of September. The deputy sheriff so swears, the paper being

lost, and this makes this proof competent evidence. The facts are, that a subpœna and copy of the bill had been served on a co-defendant of Wallace probably the latter part of August, and he had visited Wallace on Sunday before the sale on Monday to Terry, and had read the bill to Wallace. So that we have the case of a party against whom a subpœna was prayed but not served on him, with knowledge of the fact, making a sale to a third party of property specifically mentioned and sought to be reached by the bill, before service; and we may add, that third party having no notice of the fact that such suit had been brought, for the record makes this case.

Is this such a *lis pendens* as binds the purchaser? Unless otherwise provided by statute, the authorities all agree that the *lis pendens* commences with service of the process on the defendant to the suit, as to third parties at least: *Tharpe* v. *Dunlap,* 4 Heis., 586, and authorities there cited; *Murray* v. *Ballou,* 1 John. Ch. R., 576.

This is not an attachment bill, nor is it a bill under sections 4283, 4284, 4285 and 4286 of the Code—act of 1832—for the discovery of property or choses in action due or held in trust for him, the last section providing that in such a case the creditor has a lien on the property from the filing of his bill, or by registration of his judgment, under sections 2984 and 2985 of the Code, within sixty days.

The judgment was enjoined, but was dissolved and the party permitted to proceed in November, 1867;

the bill filed in August, 1871, nearly four years after, and four years, lacking four days, after the return of *nulla bona.* The statute lien was gone by not selling in a year, at least, after dissolution of the injunction.

It is not the case of a party holding in trust, as contemplated by the act of 1832, where a discovery is necessary to develop the title, but the title as it stands is on the register's book, open and notorious to all; and so far from the vendee being a trustee for the vendor, the title is good and passes completely as between them, and no trust exists to be enforced, nor was ever contemplated, either secret or open. The vendee does not hold in trust for the vendor debtor, but has the indefeasible title as to him, and holds, if fraudulent, only subject to the creditors of the vendor in enforcing their claims.

It is simply the case of a creditor who had a judgment in the circuit court, on which there had been a return of *nulla bona,* and which had been enjoined for usury in the chancery court, when injunction was dissolved, after the above lapse of time, as to part of his debt, who then files his bill to enforce the collection of this balance against land charged to have been fraudulently conveyed. It stands under the head of equity jurisdiction for the removal of clouds on titles before a sale of property, and to set aside a conveyance fraudulently made constituting such a cloud and obstacle to the enforcement of a proper claim of complainant. As far as we can see, there is no special provision of the Code

giving the lien beyond the rule of *lis pendens*, and entitling the complainant only to the benefit of this well established doctrine as settled in our law.

The doctrine of *lis pendens* in many cases operates harshly upon innocent purchasers, and can only be sustained on grounds of public policy, where private mischief must yield to public convenience: *Murray* v. *Ballou*, 1 John. Ch. R., 576.

This being so, whenever the case is within it, it must be enforced, but should not be extended beyond its settled requirements and well defined limitations.

It would seem to follow that Terry's title cannot be affected by this rule, as the party whose conveyance is to be defeated had not been served with process, and although he had knowledge of the fact that a suit had been commenced, to which he was party, still this is not such a *lis pendens* as should bind an innocent purchaser from him, without notice of the suit, if Terry be such. That he is, is sustained by his unequivocal denial in his sworn answer responsive to the bill, which is equivalent to two witnesses or one and corroborating circumstances, as well as his deposition most clearly sustaining this denial. There is no *contra* proof on this question.

The only other question, whether the sale was fraudulent, and whether that fraud was known and participated in by Terry. It is so charged. It is as positively denied by Terry in his sworn answer, the bill being unsworn, and so that answer must be met and overturned by two witnesses, or one with satisfactory corroborating circumstances.

The facts bearing on this question are, that Terry was a member of the firm of Terry & Price, of the city of Memphis, and Wallace was a customer in good standing and credit with them. The commission firm was to be dissolved on the 1st of September, 1870, and be succeeded by Terry & Co. On the 31st of August, Terry says, he purchased this land as an investment, paying $7,000 for it. He seems to have been negotiating such a trade for a month or more before, as he says he had ridden over the land then and examined it, and had the title examined by Mr. Shelton, a competent attorney at Somerville, who reported it good. He says, and the proof shows it to be true, that he paid for it by a check of the firm of which he was a member on the Union and Planters' Bank of Memphis, and this money is proven by the cashier to have been drawn on that day by Wallace on this check. Terry is charged on the books of the firm with the $7,000 on his individual account, and appears on the same day to have been credited with the same amount on the books of the firm, as he says, he having made good his account out of his personal funds. This state of facts, in connection with some others we shall mention, are relied on to fix fraud on Terry. It is argued that Wallace's account with the firm at that date was $3,169.05, and it is unreasonable this account should not have been included in this transaction. This would be so without explanation, but it is shown that $2,900 of this sum is made up of two acceptances of the firm, given a short time before, having

six and twelve months to run, and held by another firm in the city, and so there was only a small balance of a few hundred dollars in fact on the account, and that due the firm, not individually to Terry. These acceptances are shown to have been paid to the holders, or one of them, and possibly a part of the last one was paid to Price & Terry. Be this as it may, it might well be that the small balance due the firm might have been left open on the account of an esteemed customer, as Wallace is stated to have been.

It is shown that Wallace remained in possession of the land, perhaps moving on it soon after the trade. This is met by respondent by the fact that on the face of the deed he was to remain in possession until the 1st of January after the sale. It is said in Terry's answer that he gave him a power of attorney to act for him as his agent, and there is his proof that he was his tenant, and these statements are apparently contradictory. But they are explained by the fact that much of the land seems to have been bottom land, valuable mainly for its timber, which was sold to saw-mills, and Wallace acted under the power in selling the timber, as is shown, and collected the money, as is proven, as the agent of Terry, so receipting for it. Terry proves he was his tenant and agent to rent it, and as such, up to the time of his deposing, he had received from him, as such agent and tenant, $3,210, besides improvements made on the place.

It is then sought to affect Terry by statements of

Wallace made in 1870, while in occupation of the property, tending to show his purpose to avoid the present suit by his sale to Terry, with other circumstances tending to implicate Terry, such as the statement that he had deposited the price of the land with the firm, and had it there at the time. These statements are thought to be competent and to rightfully affect Terry, because of the fact that Wallace remained or was in possession of the property.

The principle of the rule invoked is thus given in the leading case on this subject—*Trotter* v. *West*, 6 Hum., 508: "If a party make a deed, and retain the possession of the property inconsistently with the terms of the deed, his statements in reference to the ownership, or contract, or terms upon which he holds possession of the property, may be received as part of the *res gestæ;* but it is otherwise where his possession is consistent with the terms of the deed or contract." See also 5 Sneed, 535; 1 Head, 548; 2 Heis., 353.

Now, it appears these statements were all made in the year 1870, after the sale to Terry, and by the terms of the deed, as we have said, possession was to be retained by Wallace until the 1st of January, 1871. In so far as the statements tend to affect Terry, they cannot be held to do so, being made in his absence, without his knowledge, and not by his vendor in possession holding inconsistent with the conveyance to him, but precisely in accord with the contract.

We have gone elaborately into the facts on which

this case turns, in view of the fact that a chancellor, for whose opinion we have the highest respect, had held this transaction void, and counsel of ability have most earnestly maintained the correctness of that decree.    We but add, that Terry, in his deposition, denies with emphasis all charges of fraud; and, if what he says is true, he is unquestionably an innocent holder of this property.    We have given all the circumstances tending to show any complication on his part in the frauds of Wallace.    No motive can well be seen for a merchant in his position to have gone into such a scheme.    His buying land seems not to have been out of the course of his habit, as he shows he had made a much larger purchase sometime before this in Arkansas.    There is no want of ability shown; on the contrary, while the firm seems not to have been a wealthy one, the cashier of the Union Bank says he would have cashed their overdraft of seven thousand dollars, or even to the amount of ten thousand dollars.

We have, then, the answer of Terry, in this case, denying every circumstance tending to implicate him. We have his deposition, equally positive, explaining the facts as we have given in this opinion.    The question is, does the complainant make out a case of complication in a fraudulent purpose by a reasonable preponderance of testimony?    No witness swears to a single fact showing actual notice of anything to aff ct Terry.    All is to be inferred over his answer from the facts herein stated.    In other words, do the entries on the books furnish both a witness and cor-

roborating circumstances to overthrow the answer? for there is no witness who proves any fraudulent purpose on the part of Terry; all must be inferred from circumstances.

The result is, that complainant fails to make out his case against Terry, the purchaser of the land, and he must be held to be an innocent purchaser, without knowledge of the fraud, and, as such, the land protected from appropriation to complainant's debt in his hands.

The chancellor's decree subjecting this land will be reversed, and the amended bill dismissed as to Terry.

It does appear that Wallace purchased fraudulently, and disposed of this land to aid his father-in-law in evading the payment of his debt, and sold to Terry with intent to avoid the complainant's claim. He swears he received the price of the property to the amount of seven thousand dollars. He shows he had received this money, and this fact is beyond question. Having deprived complainant of this land, and having obtained its price, he must be held responsible by reason of this fraudulent disposition of the land, to be liable to the complainant's claim to the amount of the consideration by him received. This money stands for the land in his hands, and he cannot escape liability by having disposed of the land. It was so held in the case of *Marsh et al*, v. *Wills & Swan*, Thompson's Cases, overruling the case of *Tubb* v. *Williams*, 7 Hum., and the same principle, also, in *Coleman* v. *Satterfield*, 2

Head, 265. These cases have been several times affirmed since.

The court in the Coleman case, 2 Head, 265, gives the principle on which this relief is given, as follows; "This measure of relief results upon either of two distinct grounds: First, that in consequence of his wrong, the estate is irrevocably lost to complainant; and second, viewed as a purchaser the party has acquired the property without any adequate consideration given for it."

This is precisely Wallace's case, and he has by sale obtained its value in money, and cannot be permitted to hold it in fraud of complainant's rights, which he has sought to defeat by such sale.

The result is, that a decree will be entered in accord with this opinion—a personal decree against Wallace for complainant's debt, not to exceed the price of the land.

Complainant will pay the costs in the court below of making the parties defendant as to the 180 acres of land, and as to his supplemental bill as to Terry, and all costs incurred as to that part of the litigation. Balance of costs in the court below and this court will be paid by Wallace.